## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **CENTURUM INFORMATION TECHNOLOGY INC.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 21-0082** |
| **GEOCENT, LLC, ET AL.** | **SECTION "L" (4)** |

## ORDER AND REASONS

### I.    BACKGROUND

This case involves a dispute over the solicitation and performance of government contracts. The genesis of this saga begins in August 2014 when Centurum Information Technology, Inc. ("Centurum") was awarded a prime contract for the Cybersecurity portion of the United States Marine Corps Enterprise Information technology Services ("MCEITS") program. The MCEITS program "provides enterprise IT services contained within a common data-center infrastructure and provides the capability to host, manage, or provision legacy systems and future Marine Corps applications and data services." R. Doc. 1 at 2. Centurum's role in this contract was to provide Independent Verification and Validation ("IV&V") services for the United States Marine Corps Datacenter. Centurum performed the MCEITS contract for more than three years, developing experience and knowledge about the needs and expectations of the government customer. During that time, Centurum developed, at its own expense, the PowerShell Information Assurance Standard Library, which automates test functions for the MCEITS program. *Id.* at 4.

In July 2017 the United States Marine Corps ("USMC") announced that the MCEITS contract would become a small, disadvantaged business set-aside procurement. In other words, only small companies would be eligible to bid to become the prime contractor. Since Centurum is

not a small company, it was unable to submit a proposal for the recompete agreement. Accordingly, Centurum contacted a small business entity named Geocent LLC ("Geocent") and introduced it to the program. The parties agreed to submit a proposal under which Geocent would be the prime contractor and Centurum would be the subcontractor. On July 12, 2017, Centurum and Geocent entered into a Mutual Non-Disclosure Agreement (the "2017 NDA") which related to the exchange of proprietary information and trade secrets. Pl. Ex. 1. The parties also entered into a teaming agreement (the "2017 Teaming Agreement"), which required that they work as partners for purposes of obtaining the MCEITS contract. Pl. Ex. 2. The contract was awarded to Geocent and Centurum in December 2017. The contract specified that Geocent and Centurum would provide USMC Datacenter Infrastructure and Services Support to customer Space and Naval Warfare Systems Center- Atlantic **("**SPAWAR SSCLANT").

Following the contract award, the parties entered into a Basic Ordering Agreement ("BOA"), which provided the framework for their relationship on the MCEITS program and allowed for the issuance of Task Orders for work to be performed by Centurum. Pl. Ex. 3. In September 2019 Geocent awarded a subcontract ("2019 Subcontract") to Centurum in connection with one of Geocent's existing prime contracts with the General Services Administration. Pl. Ex. 5. This subcontract related to services for classified work at the USMC Datacenter that were not already covered by the BOA. The 2019 Subcontract extended Centurum's period of performance for task orders until February 8, 2021 or by amendment requiring mutual consent of the parties.

In 2019, the parties anticipated that its customer SPAWAR SSCLANT would solicit proposals for the MCEITS program and determined it was in their mutual best interest to enter into a teaming agreement for that procurement ("2019 Teaming Agreement"). The parties also entered into another nondisclosure agreement ("2019 NDA") which was virtually identical to the 2017

NDA. Pl. Ex. 6. On July 24, 2020, prior to any award being made, Naval Information Warfare Systems Command ("NIWC") cancelled its procurement for the MCEITS Datacenter and Infrastructure Services Support Program. Following this cancellation, Centurum provided possible contract vehicles for future projects with the USMC, but none came to fruition. Centurum contends that Geocent never submitted or proposed any of the suggested vehicles. R. Doc. 64 at 8. Geocent claims that it considered the proposals but did not submit them when it discovered that the USMC was looking for a sole-source contract involving a smaller business. R. Doc. 59 at 13-14.

Earlier that year, Geocent and 4S-Silversword Software and Services, LLC ("Silversword") had formed a mentor-protégé joint venture called Geo4S Technologies ("Geo4S"). According to Geocent, the purpose of this joint venture was to seek contracting opportunities with the federal government—specifically the General Services Administration's "8(a) STARS III Multiple Award Contract," which Geo4S bid on in August 2020. R. Doc. 59 at 12. Silversword, a Native Hawaiian Organization, is considered a small disadvantaged business entity pursuant to Section 8(a) of the Small Business Act. Section 8(a) established a program that assists small disadvantaged business entities compete in the marketplace. Geocent claims that sometime in 2020 the USMC had "requested a proposal for a limited contract under the SBA's mentor-protégé program," which led Geocent and Geo4S to decide that awarding another subcontract to Centurum would be an unwise business decision. R. Doc. 59 at 13-14.

Centurum, on the other hand, asserts that as late as October 2020, Geocent had reassured Centurum that it would be included on an upcoming contract with the USMC. R. Doc. 64 at 7-8. Centurum argues that at the time, the parties were bound by the 2019 Teaming Agreement, the BOA, and the 2019 Subcontract's obligations, and the formation of Geo4S was a backhanded ploy to eliminate Centurum from future IV&V work for the USMC. *Id.* at 7. Centurum points out that

3

in December 2020, Mr. Arzbach of Geocent contacted eight IV&V-related Centurum employees to try and recruit them to Geo4S for a USMC procurement bid due in January 2021. *Id.* at 12. Centurum discovered this in December 2020.

On January 14, 2021, Centurum filed an application for a temporary restraining order to prevent Geocent from (1) directly or indirectly disclosing, disseminating, or using Centurum's proprietary business information and trade secrets; (2) causing, soliciting, inducing, or encouraging any employees of Centurum to leave Centurum's employment or hiring, employing, or otherwise engaging any such individual for the purpose of leaving employment with Centurum; (3) interfering with the status quo of Centurum's agreed-upon workshare under the government contracts; (4) destroying, altering, erasing, secreting, or failing to preserve any and all of such information and/or any and all records or documents that may be relevant to this lawsuit; and (5) taking any action, activity, or course of contact that is substantially detrimental to the business reputation and goodwill of Centurum. R. Doc. 8 at 2. Centurum also filed a complaint which alleges claims under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, the Louisiana Uniform Trade Secrets Act ("LUTSA"), La. Rev. Stat. § 51:1431 *et seq.*; breach of contract., specific performance, declaratory judgment, and injunctive relief. R. Doc. 1 at 2. Upon convening a telephone conference with the parties, the Court found good cause to grant the temporary restraining order ("TRO") and retain the status quo to permit the parties to present documentary evidence and testimony at a subsequent hearing. R. Doc. 11. Centurum posted the $5,000 bond required on January 15, 2021, and the TRO has been in effect since then. The Court set a preliminary injunction hearing for January 28, 2021 via Zoom.

## II.  PENDING MOTIONS

On January 26, 2021, Defendants moved to dismiss this case under the Federal Rules of Civil Procedure 12(b)(1) and 12(b)(3). R. Doc. 40. Defendants argue that the Court lacks subject matter jurisdiction over certain breach of contract claims because the 2017 and 2019 Teaming Agreements contain a mandatory arbitration clause. *Id.* at 5-6. Likewise, Defendants argue that this Court is the improper venue for claims arising under the BOA because the agreement contains a forum selection clause requiring litigation in Delaware. *Id.* at 3-4.

Pursuant to Rule 65(a)(2), the Court consolidated the preliminary injunction hearing with the trial on the merits. Fed. R. Civ. P. 65(a)(2). The hearing was held on January 28, 2021 via Zoom and continued for two additional days. Both Plaintiff and Defendants presented live witness testimony and submitted numerous exhibits, declarations, and deposition designations. The Court instructed the parties to submit post-trial briefs, which the parties filed on February 4, 2021. After considering the applicable law, the evidence presented at trial, and the post-trial briefs, the Court is now ready to rule. The Court will first consider Defendants' motion to dismiss and then turn to Centurum's request for injunctive relief.

## III.   DEFENDANTS' MOTION TO DISMISS

### a.   *Rule 12(b)(1) and 12(b)(3) Motions to Dismiss*

Federal Rule of Civil Procedure 12(b)(1) allows a party to seek dismissal of a complaint based on "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). For a Rule 12(b)(1) motion, the burden of proof rests on the party asserting jurisdiction. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *McDaniel v. United States,* 899 F. Supp. 305, 307 (E.D. Tex. 1995)). "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Id.* (citing *Hitt v. City of Pasadena,* 561 F.2d 606, 608 (5th Cir. 1977) (per curiam)). When

examining a Rule 12(b)(1) motion, the district court may consider matters of fact that may be in dispute. *Id.* (citing *Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir. 1981)). "Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Id.* (citing *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.,* 143 F.3d 1006, 1010 (5th Cir. 1998)).

In this case, Defendants' claims under Rule 12(b)(3) also attack this Court's jurisdiction. Federal Rule of Civil Procedure 12(b)(3) permits parties to file for dismissal based on improper venue. Fed. R. Civ. P. 12(b)(3). "A plaintiff must show facts that support the plaintiff's assertion of venue. In reviewing the allegations of a Rule 12(b)(3) motion, a court must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff." *Cabrales-Huerta v. United States*, No. SA-06-CV-878-WRF, 2007 WL 1512025, at *2 (W.D. Tex. May 18, 2007) (citing 5B CHARLES A. WRIGHT AND ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1352 (3d ed. 2004)). A complaint (or claim) is subject to dismissal under Rule 12(b)(3) when a binding forum selection clause requires the plaintiff to litigate its dispute in another court. *Lim v. Offshore Specialty Fabricators, Inc.*, 404 F.3d 898, 902 (5th Cir. 2005). Similarly, a claim must be dismissed under Rule 12(b)(1) or 12(b)(3) when it is subject to a mandatory arbitration clause. *Otto Candies, LLC v. Drager Safety Ag & Co.*, Civ. Act. No. 13-447, 2014 WL 6751582, at *1 (E.D. La. Dec. 1, 2014). With those rules in mind the Court now turns to the contracts central to this case and the substance of the motion to dismiss.

**b.** ***Jurisdiction over the Contracts at Issue***

Centurum's petition alleges that Defendants breached certain terms governing teaming obligations, hiring limitations, and proprietary information in the various contracts executed by

6

the parties, which include the 2017 and 2019 Teaming Agreements, the 2017 and 2019 NDAs, the BOA, and the 2019 Subcontract. Defendants contend that these agreements are no longer in effect, so it is not possible that they breached the hiring, solicitation, and exclusivity obligations of the contract through their Geo4S venture. Defendants also contend that they never disclosed or misused Centurum's proprietary information in violation of the agreements, and the information Centurum is most concerned with is not proprietary in nature. R. Doc. 40. Defendants ask that the Court dismiss Plaintiff's contract-related claims because the agreements contain mandatory arbitration and forum selection clauses. *Id.*

Centurum, on the other hand, argues that the Court should not dismiss its claims because "the Teaming Agreements and NDAs cover Defendants' alleged conduct and provide that Plaintiff may seek injunctive relief from any court of competent jurisdiction, and the BOA's forum selection clause is merely permissive." R. Doc. 49 at 6. Additionally, Plaintiff argues that Defendants' alleged misappropriation of proprietary information "underlies each and every one of Plaintiff's claims," so the parties cannot be compelled to arbitrate any of the claims at issue. *Id.* Centurum and Geocent do not appear to dispute the validity of the agreements themselves, so the Court will first analyze the terms and the effects of the agreements themselves. Next, the Court will determine whether it has subject matter jurisdiction over Centurum's claims in view of the contractual language. Finally, should the Court determine that it does not have jurisdiction over certain claims, it will dismiss those claims from this case.

### i. The 2017 and 2019 Teaming Agreements

The 2017 Teaming Agreement was executed on July 12, 2017 by Centurum and Geocent. Def. Ex. 2. The stated purpose of the teaming arrangement was "to develop the best management and technical approach to the requirements for USMC Datacenter Infrastructure and Services

Support, hereinafter referred to as 'the Program,' to be procured by SPAWAR SSCLANT (the 'Customer') by the award of a contract in response to a proposal submitted by the team parties."

*Id.* at 1. The 2017 Teaming Agreement required that Centurum and Geocent work as partners for the purpose of obtaining the MCEITS contract. *Id.* The 2017 Teaming Agreement imposes hiring limitations and exclusivity provisions during the term of the agreement:

> Since a joint proposal will require the full cooperation of the parties, both parties agree that **they will not actively participate in efforts that are competitive to this Agreement or compete independently for the Program during the duration of the Agreement**.
> * * * *
> During the period that this Agreement is in effect, **each party agrees not to knowingly solicit for employment, recruit, or otherwise proselytize any technical or professional employees of the other party** participating in the effort identified in this agreement…

*Id.* at ¶¶ 19, 21. Emphasis added. Articles 14 and 15 of the agreement relate to proprietary information, and the obligations survive termination of the agreement:

> In carrying out the terms of this Agreement, **it may be necessary for the parties to provide proprietary information to one another**. In such event, the disclosure and use of all proprietary information shall be in accordance with the Non-Disclosure Agreement executed by the Parties.
>
> Nothing contained in this Agreement shall, by express grant, implication, estoppel or otherwise, **create in either party any right, title, interest, or license in or to the inventions, patents, technical data, computer software, or software documentation of the other party**.

*Id.* at ¶¶ 14, 15, 16. Emphasis added. Upon termination, either party may pursue their individual technical approaches individually or with other partners, within certain limitations:

> In the event that this Agreement is terminated, **either party shall be free to pursue its individual technical approaches in association with the successful contractor or a third party for work that is the subject of this Agreement**.

*Id.* at ¶ 17. The 2017 Teaming Agreement specifies that it will terminate upon any of the following events:

> This Agreement shall terminate and all rights and duties hereunder, **except those in Articles 14, 15**, 19, and 30 shall cease upon the first to occur of the following:

* * * *

> **Award of a prime contract to the Prime and a subcontract to the Sub**, as contemplated by this Agreement.

* * * *

> **The expiration of one (1) year from the effective date hereof**; provided, however, if the Proposal has been submitted and is under consideration by Customer upon expiration of such one (1) year period, this Agreement will continue in force until terminated pursuant to one of the foregoing conditions.

*Id.* at ¶ 16. Emphasis added. In the event of a claim or controversy, the parties are required to arbitrate any dispute except for claims arising from the improper use or disclosure of proprietary information:

> Any controversy or claim arising out of or relating to this Agreement shall be resolved in the following manner:
>
> > a. The parties agree to enter into Negotiation to resolve any dispute. Both parties agree to negotiate in good faith to reach a mutually agreeable settlement within a reasonable time.
> >
> > b**. If negotiation is unsuccessful, the Parties agree to enter into binding Arbitration**. The American Arbitration Association (AAA) Commercial Rules (most recent edition) are to govern this Arbitration. The Arbitration shall take place in the Parish of Jefferson, State of Louisiana. The Arbitrator shall be bound to follow the applicable provisions of this Teaming Agreement and Louisiana law in adjudicating this dispute. It is agreed by both parties that the Arbitrator's decision is final, and that no party may take any action, judicial or administrative, to overturn this decision. The judgment rendered by the Arbitrator may be enforced in any court having jurisdiction hereof.
> >
> > ****
> >
> > e. Notwithstanding the above, **either party may seek injunctive relief in any court of competent jurisdiction against improper use or disclosure of proprietary information**.

*Id.* at ¶ 31. Emphasis added.

SPAWAR SSCLANT awarded the USMC Datacenter Infrastructure and Services Support.contract to Geocent in December 2017. Following this award, Geocent and Centurum entered into a BOA which provided the framework for their relationship on the MCEITS program and governed the issuance of Task Orders for work to be performed by Centurum. Pl. Ex. 3. By

its express terms, the 2017 Teaming Agreement terminated when the parties received the SPAWAR SSCLANT award in December 2017. Def. Ex. 2 at ¶ 16. The obligations regarding the use and disclosure of proprietary information, however, remain due to the specific carveout in various parts of the agreement.

In 2019, Geocent and Centurum anticipated that SPAWAR SSCLANT would solicit proposals for a follow-on contract related to its existing work for the MCEITS program. The parties agreed to work together to win this procurement and executed a second teaming agreement on November 25, 2019 in connection with this effort. Def. Ex. 5. The 2019 Teaming Agreement is very similar to the 2017 Teaming Agreement. The 2019 Teaming Agreement contains the following solicitation and exclusivity limitations:

> Since a joint proposal will require the full cooperation of the parties, Neither the Team Member, nor any of its divisions, affiliates or subsidiaries shall:
>
> a. **provide the data or perform the services described in Attachment A** to any entity other than Team Leader,
> b. **collaborate with any entity other than Team Leader** for the purposes of the Solicitation,
> c. **independently submit a proposal** for the Work,
> d. undertake **efforts that in any manner are competitive to this Agreement**, or
> e. in the event the Solicitation will lead to a multiple-award prime contract in which Geocent is an awardee, support the efforts of any other awardee, or its subcontractors, in relation to its resultant prime contract without Geocent's written consent.

*Id.* at ¶ 19. Emphasis added. The 2019 Teaming agreement contains language regarding intellectual property and the use and disclosure of proprietary information that is identical to its 2017 predecessor. *Id.* at ¶¶ 14-15. Additionally, the 2019 Teaming Agreement enumerated various conditions that would result in the termination of the agreement, including:

> b. An ***announcement* from the Customer that the Program has been canceled**.

\* \* \* \*

    d.    **Award of a prime contract to the Prime and a subcontract to the Sub**, as contemplated by this Agreement.

\* \* \* \*

    g.    **The expiration of one (1) year from the effective date hereof**; provided, however, if the Proposal has been submitted and is under consideration by Customer upon expiration of such one (1) year period, this Agreement will continue in force until terminated pursuant to one of the foregoing conditions.

*Id.* at ¶ 16. Like the 2017 Teaming Agreement, the proprietary information and intellectual property restrictions imposed survive termination of the agreement due to an express carveout. *Id.* Finally, the 2019 Teaming agreement also contained a mandatory arbitration provision similar to its predecessor's:

Any controversy or claim arising out of or relating to this Agreement shall be resolved in the following manner:

    a.  **The Parties agree to enter into Negotiation to resolve any dispute**. Both parties agree to negotiate in good faith to reach a mutually agreeable settlement within a reasonable amount of time.

\* \* \* \*

    b.  If negotiation is unsuccessful, **the Parties agree to enter into binding Arbitration**.

\* \* \* \*

    e.  Notwithstanding the above, **either party may seek injunctive relief in any court of competent jurisdiction against improper use or disclosure of proprietary information**.

*Id.* at ¶ 29. Emphasis added. The 2019 Teaming Agreement provided that "[i]n the event that this Agreement is terminated, **either party shall be free to pursue its individual technical approaches** in association with the successful contractor or a third party for work that is the subject of this Agreement, **subject to the provisions of the Non-Disclosure Agreement executed by the Parties**." Def. Ex. 5 ¶ 17. Emphasis added.

On July 24, 2020, prior to any award being made, NIWC announced that it would cancel its procurement effort for the MCEITS Datacenter and Infrastructure Services Support Program underlying the 2019 Teaming Agreement. This did not cancel the program itself, however, pursuant to Paragraph 16(a). In this agreement, "Program" is defined as MCEITS Datacenter and Infrastructure Services Support. *Id.* at 1. As pointed out by Centurum, the NIWC "did not disestablish the Datacenter; and it certainly did not cease needing the services – 'the requirements' – previously sought under the PR. The Program lived on (to this day) while the specific solicitation under which the Program requirements were originally to be procured ceased to serve as the vehicle for acquiring those services going forward." R. Doc. 52 at 8. Rather, the 2019 Teaming Agreement likely terminated on November 25, 2020, pursuant to Paragraph 16g, which provides an expiration of one year from the agreement's effective date. *Id.* at ¶ 6g. Due to the injunctive relief carveout, however, the parties' obligations regarding the use and disclosure of proprietary information remain. Def. Ex. 5, ¶ 16b.

Based on the mandatory arbitration provisions in the 2017 and 2019 Teaming Agreements, Plaintiff's claims which are unrelated to misuse or disclosure of proprietary information must be resolved through arbitration. Specifically, the claims in Count III of Centurum's complaint relate to 1) collaborating with other entities for the MCEITS/USMC work or otherwise engaging in efforts competitive to the Teaming Agreements, 2) negotiating the terms of a subcontract in good faith, and 3) refraining from active solicitation or direct recruitment of Centurum's employees must be dismissed. R. Doc. 1 at 15-16. The Court will assess the merits of Count III's proprietary information-related claims in turn**.**

    ii.  **The 2017 and 2019 NDAs**

In conjunction with each of the 2017 and 2019 Teaming Agreements, the parties executed the 2017 and 2019 NDAs, which relate to the exchange of proprietary information and trade secrets. Pl. Exs. 1, 4. On July 12, 2017, Centurum and Geocent executed the 2017 NDA, which requires the parties to preserve and protect the proprietary information of the other and "prevent unauthorized use of disclosure of proprietary information." Pl Ex. 1 at ¶ 3. Centurum and Geocent executed the 2019 NDA on November 25, 2019. Pl. Ex. 4. Since the 2017 and 2019 NDAs are essentially identical, they will be discussed together. The 2017 and 2019 NDAs define "proprietary information" as the following:

> Definition. For purposes of this Agreement, "Proprietary Information" means all information , including, financial and statistical data, sales, customer and client information, business methodologies, inventions, techniques, strategies, tactics, samples, prototypes, drawings, computations, processes, data, know-how and business plans, related to the Subject Matter furnished by the Parties, or their directors, officers, employees, agents and advisors, (the "Representatives") in connection with the Purpose during the term of this Agreement, in whatever form, under or in connection with this Agreement and specifically designated as Proprietary Information.

Pl. Exs. 1 at ¶ 1; 4 at ¶ 1. The 2017 and 2019 NDAs impose requirements for marking certain information as proprietary upon disclosure:

> When disclosed, in writing, **Proprietary Information shall be identified and labeled as such**. When disclosed orally or visually, such Proprietary Information must be identified as Proprietary Information at the time of disclosure and summarized in a written document which is identified and labeled "Proprietary Information" and provided to the receiving party within ten (10) business days of the initial disclosure in order to receive the protection afforded by this Agreement.

Pl. Exs. 1 at ¶ 1; 4 at ¶ 1. Emphasis added. There is no definitive term to the 2017 and 2019 NDA, and the obligations regarding proprietary information survive termination:

> Term of Agreement. This agreement continues in effect until it is terminated. Either party may terminate this Agreement upon thirty (30) days written notice to the other. **Notwithstanding the termination, the receiving party shall continue to protect the proprietary information as provided herein for a period of four (4) years from the termination date of this Agreement and all provisions of this Agreement shall survive with respect to such information**.

Pl. Exs. 1 at ¶ 2; 4 at ¶ 2. Emphasis added. The 2017 and 2019 NDAs also impose limitations on

the disclosure and use of proprietary information:

> Limitation on Disclosure and Use. **The Receiving Party shall preserve and protect the Proprietary Information received from the Disclosing Party under this Agreement in confidence and shall protect the Proprietary Information** by using the same degree of care, but no less than a reasonable degree of care, to prevent unauthorized use or disclosure of the Proprietary Information as the Receiving Party uses to preserve and protect its own Proprietary Information.
>
> * * * *
>
> **If the Purpose of this Agreement is the submittal of a proposal to the United States Government, the Party submitting said proposal may use the other Party's Proprietary Information in such submittal, provided that appropriate protective legends**, as allowed by the FARS and DFARS, are affixed identifying the information as Proprietary and protecting its further disclosure.

Pl. Exs. 1 at ¶ 3; 4 at ¶ 3. Emphasis added. Finally, the 2017 and 2019 NDAs impose obligations

on each party upon termination:

> Upon termination, **each Party shall cease use of the other Party's Proprietary Information, and shall either return or destroy all Proprietary Information, including copies and excerpts thereof.** Upon the written request of either Party the Receiving Party shall furnish the other Party with written certification of destruction or return.

Pl. Exs. 1 at ¶ 7; 4 at ¶ 7. Emphasis added. The parties have not indicated whether the 2017 or

2019 NDAs were ever terminated by the parties. Accordingly, the Court must presume that both

are still in effect, and that the obligations remain.

The 2017 and 2019 NDAs do not specify a forum or compel arbitration on certain claims.

Instead, they specify that the "Agreement shall be governed by the laws of the state of Louisiana,

without regard to its conflict of laws principles." Pl. Exs. 1 at ¶ 13; 4 at ¶ 13. Accordingly, this

Court is the appropriate forum for litigating Count IV of Centurum's complaint, which relates

specifically to Geocent's alleged breach of the 2017 and 2019 NDAs. Therefore, Count IV's breach

of contract claims may be dealt with in a later proceeding brought in this Court.

14

### iii. The BOA

Following the MCEITS contract award in December 2017, the parties executed a Basic Ordering Agreement ("BOA"), which provided the structure for their working relationship. Pl. Ex. 6. The BOA contains extensive requirements governing the use and disclosure of proprietary information. *Id.* at 14. For example, the parties agreed "to hold in confidence and not disclose to other parties, any Proprietary Information and/or Trade Secrets exchanged hereunder," and the BOA detailed circumstances under which information exchanged cannot be proprietary or trade secret. *Id.* at 13. Like the 2017 and 2019 Teaming Agreements, the BOA contains a dispute resolution clause requiring that the parties first attempt to work out any disputes informally. Pl. Ex. 6 at 9. If these efforts fail, the parties may pursue litigation in Delaware:

> In the event the Contractual Points of Contact are unable to resolve a dispute within thirty (30) calendar days following receipt of the written notification (or such longer period if extended by the mutual agreement of both parties) of the dispute, **either party may litigate any disputes arising under or related to this Agreement before a Delaware court of competent jurisdiction or forum**.

*Id.* at 9. The specified term of the agreement is "Effective Date- December 31, 2019," but the parties may "extend the BOA ordering period beyond 12/31/2019, by BOA amendment." *Id.* at 1. Jeffrey Thompson, Vice President of Norfolk Operations at Centurum, testified that the parties are still working under the BOA. Trial Testimony of Jeffrey Thompson. However, it is unclear whether the parties ever extended the BOA because no amendment was ever presented to the Court.

Contractual claims are subject to dismissal "where the parties 'use express language clearly indicating that the forum selection clause excludes all other courts before which those parties could otherwise properly bring an action.'" *Ashall Homes Ltd. v. ROK Entertainment Group Inc.*, 992 A.2d 1239, 1245 (Del. Ch. 2010) (quoting *Eisenbud v. Omnitech Corp. Solutions, Inc.*, 1996 WL 162245, at *1 (Del. Ch. Mar. 21, 1996)); *see also Ginter ex rel. Ballard v. Belcher, Prendergast & LaPorte*, 536 F.3d 439, 445 (5th Cir. 2008). "In order to be mandatory, a forum selection clause

must contain clear language specifying that litigation must occur in the specified forum. For a forum selection clause to be exclusive, it must go beyond establishing that a particular forum will have jurisdiction and must clearly demonstrate the parties' intent to make that jurisdiction exclusive." *Lawson Envtl. Servs., LLC v. Enviroworks, LLC*, No. 2:15-cv-6379, 2016 WL 4496720, at *2 (E.D. La. Aug. 26, 2016) (internal citations and quotations omitted). "By contrast, a permissive [forum selection clause] is only a contractual waiver of personal-jurisdiction and venue objections if litigation is commenced in the specified forum. Only mandatory clauses justify transfer or dismissal." *Id.* at *2 (footnote omitted).

The forum selection clause in the BOA states that "either party *may litigate* any disputes arising under or related to this Agreement." Pl. Ex. 6 at 9. Emphasis added. The use of "may" in this clause is crucial. *See Too Easy Entm't, L.L.C. v. Seven Arts Pictures, Inc.,* No. CIV.A. 04-2182, 2004 WL 2480475, at *3 (E.D. La. Nov. 3, 2004) ("The use of the word 'may' in a forum selection clause proves that the clause is permissive, and not mandatory."). Unlike the 2017 and 2019 Teaming agreements, where the parties "*agree to enter into* binding arbitration," Def. Ex. 2 at ¶ 13b, the use of "may" in the BOA operates more like a contractual waiver of personal jurisdiction in the Delaware forum. *See Caldas & Sons, Inc. v. Willingham,* 17 F.3d 123, 128 (5th Cir. 1994) (holding "this is not a situation where the contract, on its face, clearly limits actions thereunder to the courts of a specified locale" (quoting *Keaty v. Freeport Indonesia, Inc.,* 503 F.2d 955 (5th Cir. 1974)); *Lawson,* 2016 WL 4496720 at *2. Therefore, the Court concludes that the forum selection clause in the BOA is permissive. Count I of Centurum's complaint asserts claims regarding Geocent's alleged breach of the BOA. R. Doc. 1 at 13-14. Accordingly, Count I survives Defendants' motion to dismiss, and Centurum may pursue BOA-related contract breach claims in a later proceeding before this Court.

iv.  **The 2019 Subcontract**

In September 2019 Geocent awarded the 2019 Subcontract to Centurum in connection with one of Geocent's existing prime contracts with the General Services Administration. Pl. Ex. 5. This subcontract related to services for classified work at the USMC Datacenter that were not already covered by the BOA. By its terms, the Subcontract ends on February 8, 2021, "unless amended in writing by mutual consent of the parties." Pl. Ex. 5 at 2. Like the BOA, the 2019 Subcontract contains limitations regarding the hiring and solicitation of each other's employees:

> Hiring Limitations. During the terms of this subcontract, **both parties agree that they will not actively solicit or directly recruit personnel of the other party who are providing support directly associated with this Agreement for employment purposes**. This provision does not restrict the rights of either company to hire personnel of the other party who respond to public employment advertising of a general nature or who seek employment opportunities with the other party on an unsolicited basis.

*Id.* at ¶ 5.3. Emphasis added. Further, the 2019 Subcontracted contains restrictions on the disclosure and use of the Geocent's proprietary information. *Id.* at ¶ 10.

The 2019 Subcontract specifies that "all controversies or disputes arising out of this Subcontract shall be heard in either the 24th Judicial District Court for the parish of Jefferson, or the U.S. District Court for the Eastern District of Louisiana, New Orleans, Louisiana." *Id.* at ¶ 13. Count II of Centurum's complaint asserts claims arising out of Geocent's alleged breach of the 2019 Subcontract. R. Doc. 1 at 14-15. The forum selection clause in this agreement confirms that this Court has jurisdiction over the claims in Count II of Centurum's complaint, which the parties do not appear to dispute. The Court now turns to Centurum's request for injunctive relief.

## IV.  CENTURUM'S APPLICATION FOR INJUNCTIVE RELIEF

Having determined the claims over which this Court has jurisdiction and the claims that must be resolved through arbitration, the Court will now examine whether Centurum is entitled to

the injunctive relief it seeks. The Court issued a TRO on January 14, 2021 which enjoined

Defendants from the following;

1. **Contacting or soliciting** Centurum personnel;
2. Accessing, studying, copying, using, disclosing, disseminating, taking notes on, or otherwise considering for any purpose **Plaintiff's proprietary information and trade secrets;**
3. **Destroying, altering, erasing, secreting, or failing to preserve any and all of Plaintiff's business materials**, property, proprietary information, confidential information or trade secrets, and/or any and all record or documents that may be relevant to this lawsuit, wherever located, and in whatever form, including but not limited to any documents, emails, reports, software, files, electronic data, tangible evidence, financial records, and any and all communications between any employee, member, owner, investor, or consultant of Geocent and/or Silversword, or their parent companies, subsidiaries, or joint ventures;
4. **Failing to return to Centurum the information, property, and storage devices containing Plaintiff's proprietary information and/or trade secrets** that are identified in the Verified Complaint and supporting documents.

R. Doc. 11. Emphasis added. The TRO also required Geocent to:

1. Take all necessary steps to **put on hold the Geo4S Technologies joint venture proposal** submitted to the Government for the follow-on MCEITS contract and any other proposals that do not maintain Centurum's guaranteed workshare rights or which are based, in whole or in part, on Centurum's proprietary data or employee assets;
2. **Provide the names(s) of individual(s) with knowledge and who can testify regarding all material in Geocent's possession** that is based on the technical and price/cost data and/or input provided by Centurum, to include all notes and other documents generated, including but not limited to the April 2020 "Solutioning" session that Geocent hosted with two Centurum personnel; and
3. **Install or cause to be installed a comprehensive litigation hold**, for Geocent, Silversword, and Geo4S Technologies, on all hard copy and electronic documents and communications pertaining to the underlying projects and proposals, from 2017 to the present, to include without limitation all dealings with Centurum, the Government customer, and those acting in concert with defendants.

*Id.* Emphasis added. The Court must decide whether it will convert this TRO to a preliminary

injunction.[1]

---

[1] In its Post-Trial Brief, Centurum requests that any injunctive relief "enjoin Defendants through the December 2021 option year period for which Geocnt/Centurum team is already under contract" so that "**Geocent remains the prime contractor, Centurum remains the IV&V subcontractor,**

Any injunctive relief is considered a drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion. *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989). The district court may grant a preliminary injunction only if the movant establishes four requirements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of the relief sought; (3) the threatened injury to plaintiff outweighs the threatened harm to defendant; and (4) the relief will not disserve the public interest. *Brock Servs., LLC v. Rogillio*, 936 F.3d 290, 296 (5th Cir. 2019) (citing *Cardoni v. Prosperity Bank*, 805 F.3d 573, 579 (5th Cir. 2015)); *see also* "*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking injunctive relief must satisfy a cumulative burden of proving all four requirements. *Id.* "The grant of injunctive relief is an extraordinary remedy which requires the movant to unequivocally show the need for its issuance." *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997) (internal citation omitted). The Court will analyze the requirements for injunctive relief in turn.

### a. Requirement 1- Likelihood of Success on the Merits

Centurum's likelihood of success on the merits hinges upon whether the information and technology central to the events in this case are classified as proprietary trade secrets. Centurum asserts that certain information about its employees, its software, and its Technical Approach are proprietary trade secrets. Defendants, on the other hand, argue that none of this information and technology is proprietary, and even if it were, Defendants never misappropriated or disclosed it. The Court will turn first to Geocent's alleged solicitation of Centurum employees. Although there

---

**and the Marine Corps continues to receive uninterrupted IV&V services from the current team with proven expertise.**" Plaintiff's Post-Trial Brief at 1-2. This new request is well outside the scope of Centurum's original application for injunctive relief and the TRO in place. R. Docs. 8-1 at 1-2; 11. Accordingly, this request is not before the Court at this time.

are a number of contract breach claims at issue, the Court will first focus on whether any trade

secrets existed in the form of employee information, software, or Centurum's Technical Approach

at the time of the alleged injuries before moving to determination of the likelihood of success on

the merits.

The DTSA defines "trade secret" as the following:

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--

> (A) the owner thereof **has taken reasonable measures to keep such information secret**; and
> (B) **the information derives independent economic value**, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

18 U.S.C. § 1839(3). Emphasis added. Likewise, the LUTSA defines "trade secret" as:

[I]nformation, including a formula, pattern, compilation, program device, method, technique, or process, that:
> (A) **derives independent economic value**, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and
> (B) is the subject of efforts that are reasonable under the circumstances **to maintain its secrecy**.

La. Stat. Ann. § 51.1431(4). Emphasis added. The DTSA gives this Court the authority to "enter

such orders and take such other action as may be necessary and appropriate to preserve the

confidentiality of trade secrets." 18 U.S.C. § 1835(a).

### i. Centurum Employee Information

In December 2020, Mr. Arzbach of Geocent contacted eight Centurum IV&V employees

and asked if they would be interested in rebadging at Geo4S and, if so, what their target salaries

would be. 1/29/21 Hear. Tr. at 32:21 – 33:14. Mr. Arzbach recorded employees' numbers, cell

phone numbers, and labor categories under Geocent's current prime contract with NIWC Atlantic, and comments about the employees, on the internal spreadsheet. *See* Pl. Exs. 18-20. Mr. Arzbach testified that he discussed employer benefits with the Centurum employees as well. Arzbach Tr. 149:14-150:7; Trial Tr., Day 2 104:2-4; Pl. Ex. 21 at 3 (Notes/Comments column). Geocent acknowledged that "[t]hese contacts occurred while the hiring limitations of the BOA and [the 2019] subcontract remained in effect." Def. Post-Trial Brief at 33. However, Geocent argues that it never asked about, received, or used any confidential or proprietary information during these phone calls, and it never went so far as offering anyone employment in violation of the BOA and 2019 Subcontract. *Id.* at 33-34. Centurum, on the other hand, claims that the salary and benefits information obtained during these phone calls is proprietary, and these efforts directly violated the BOA, the 2019 Subcontract, the 2017 and 2019 Teaming Agreements, and the 2017 and 2019 NDAs. Pl. Post-Trial Brief at 11. Centurum claims that information recorded "reinforces Defendants' intent to use Centurum's employees as a conduit to obtain Centurum's confidential and proprietary information." Pl. Post-Trial Brief at 41.

The Court concludes that the target salary, benefits, and other information gleaned from Mr. Arzbach's conversations with the Centurum employees are not proprietary in nature. Neither Centurum nor Geocent cited convincing case law on this topic, so the Court must analyze this information by analyzing the statutory requirements of the DTSA and LUTSA. First, Centurum has not shown that it derives economic benefit from maintaining the secrecy of its employees' salary, which is required under both the DTSA and the LUTSA. 18 U.S.C. § 1839(3)(B); La. Stat. Ann. § 51.1431(4)(A). Similarly, Centurum has not demonstrated what efforts and procedures were in place (if any) to maintain the secrecy of this employee information. Merely claiming that Geocent *intended* to use these employees as a conduit to obtain Centurum's proprietary

information does not suffice. Thus, the Court concludes that Geocent did not use or misappropriate Centurum's proprietary information through Mr. Arzbach's December 2020 conversations. Any claims arising from the 2017 and 2019 Teaming Agreements that are unrelated to proprietary information must be resolved through arbitration as previously discussed, so the Court will not decide whether Geocent's inquiries breached the hiring limitations of those agreements.

## ii. Centurum's Software

From 2014 to 2015, Centurum developed the PowerShell Information Assurance Standard Library ("PSIASTAND"), which automates test functions for the MCEITS program. *Id.* at 4. Centurum developed the tool itself and further refined it at its own expense. Trial Tr. Day 1 85:16-24; 89:6-25; 99:17-101:1. At the time, Centurum was the prime contractor for the Cybersecurity portion of the MCEITS program and was not yet working with Geocent. The purpose of the PSIASTAND was to increase the efficiency Centurum's IV&V work. Trial Tr., Day 1 49:16-18; 99:13-16. The tool was not a deliverable under the MCEITS government contract, and the contract "does not require the use of the tool or automation to do the work." Trial Tr., Day 3 27:21-28:1.

It is clear that Centurum derives independent economic benefit from the PSIASTND, and Centurum has gone great lengths to keep it protected. Centurum's Cyber Security Program Manager Carmen Diaz testified that PSIASTAND is very valuable to Centurum because the tool allows a smaller number of personnel to handle a workload that would ordinarily require many more. Trial Testimony of Carmen Diaz. The tool gives Centurum a competitive edge and "helped build [Centurum's] reputation with the customer." Trial Tr., Day 1 102:1-1; 112:14-17. The PSIASTAND is password-protected and resides on a server to which Geocent does not have access. 1/28/21 Hear. Tr. at 126:21 – 127:1. Centurum safeguards its proprietary information and the PSIASTAND tool by limiting access through technical means, by educating employees, and

22

through the implementation of policies and procedures. Trial Tr., Day 1 49:19-54:1 (describing Centurum's implementation of its policies, including utilizing password protection and multi-factor authentication, restricting access to certain Centurum users, storing proprietary information on limited hardware, encrypting data, and enabling remote-wipe features). For these reasons, the Court concludes that the PSIASTAND tool is a proprietary trade secret under both the DTSA and the LUTSA.

### iii.   Centurum's Technical Approach

Centurum's Technical Approach is comprised "of its approach to IV&V, how it achieves efficiencies, its PSIASTAND tool, and how the tool is utilized to automate IV&V services." Trial Tr., Day 1 49:7-18. Centurum provided its Technical Approach to Geocent in September 2017 in connection with the parties' MCEITS procurement efforts. Pl. Ex. 61; 74. The parties had been drafting a proposal for the USMC, and Centurum's Technical Approach spanned around five pages. Pl. Ex. 74. Defendants take the position that Centurum did not sufficiently identify and label its Technical Approach as proprietary pursuant to the 2017 NDA, which states that "proprietary information shall be identified and labeled as such" when disclosed in writing. Defendants' Post-Trial Brief at 21; Pl. Exs. 1 at ¶ 1; Def. Ex. 34. However, Mr. Diaz testified that he included a confidentiality legend on the cover email he submitted to Geocent to designate the information as proprietary. Trial Tr., Day 1 106:19-109:20; Pl. Ex. 74. The legend reads:

> CONFIDENTIALITY NOTICE: This message and any attachments or files transmitted with it (collectively, the "Message") are intended only for the addressee **and may contain information that is privileged, proprietary and/or prohibited from disclosure by law or contract**.

Pl. Ex. 74 at 1. Emphasis added. Further, the document into which it was placed contains a restrictive legend that reads: "*Use or disclosure of information on this page is subject to disclosure notice.*" *Id.* at 3 at 5.

23

Defendants argue that even if the Technical Approach had been properly labeled, it is not proprietary because "it is based entirely on publicly available or government owned standards for providing cybersecurity services, government tools and practices for providing IV&V services, and reports available publicly or from government sources." Def. Post-Trial Brief at 27. Mr. Diaz, on the other hand, described the Technical Approach as the "recipe for how we execute the work," and that "in any technical approach you have to reference publicly available government standards." Trial Tr., Day 3 6:9-10, 65:9-14, 66:23-67:1. The Court finds that Centurum's marking of the Technical Approach was appropriate when read together with the 2017 NDA. Therefore, the Court must now determine whether the Technical Approach can be classified as a trade secret.

Here, Centurum's Technical Approach is akin to a recipe trade secret. Although the ingredients themselves may be publicly available, the combination of ingredients, their exact quantities, and the method of preparation comprise a trade secret. It is well established that a compilation or aggregation of otherwise publicly available information constitutes a trade secret. *3M v. Pribyl*, 259 F.3d 587, 595-96 (7th Cir. 2001) ("A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret") (quoted by *Source Prod. & Equip. Co. v. Schehr*, No. CV 16-17528, 2019 WL 4752058 (E.D. La. Sept. 30, 2019)); *see also Catalyst & Chem. Servs., Inc. v. Global Ground Support*, 350 F. Supp. 2d 1, 9 (D.D.C. 2004), *aff'd* 173 F. App'x 825 (Fed. Cir. 2006) ("[I]t is widely accepted that a trade secret can exist in a combination of characteristics each of which, by itself, is in the public domain." (citation omitted)); *Geo Grp., Inc. v. Cmty. First Servs., Inc.*, No. 11-CV-1711 CBA, 2012 WL 1077846 (E.D.N.Y. Mar. 30, 2012) ("It is well-settled that although 'matters of public knowledge or of general knowledge in an industry cannot be

categorized as trade secrets, a compilation of the public information which incorporates the information in a unique way is, nonetheless, protectable as a trade secret.").

A trade secret holder must also derive independent economic value from the trade secret and take reasonable measures to maintain its secrecy. 18 U.S.C. § 1839(3); La. Stat. Ann. § 51.1431(4). The Technical Approach was a prominent feature of the solicitation bid for the 2017 MCEITS procurement, spanning five pages. Pl. Ex. 74. The Technical Approach, which encompasses the PSIASTAND tool, allows Centurum to achieve unique efficiencies and provides a competitive advantage over other providers. Trial Tr. Day 1 101:6-25, 102:1-18. Further, as described above, Centurum safeguards its proprietary information generally through company policies, password protection and multi-factor authentication, restricted access, and other means and sufficiently marked the Technical Approach as proprietary when shared with Geocent. Trial Tr., Day 1 49:19-54:1. Accordingly, the Court concludes that Centurum's Technical Approach drives independent economic value for Centurum and that Centurum took reasonable measures to keep it secret.

### iv.   Conclusion- Likelihood Success on the Merits

It is now undisputed that 1) Ralph Arzbach of Geocent contacted Centurum's IV&V employees in December 2020 regarding employment at Geo4S; 2) beginning in 2020, Geocent collaborated with Silversword via Geo4S to bid on at least two federal contracts; 3) Geo4S used substantial portions of Centurum's Technical Approach in a January 12, 2021 submission associated with the USMC Hybrid Cloud Services Program procurement. Trial Tr., Day 1 116:22-119:12; Trial Tr., Day 2 32:21 – 33:3, 38:11-13, 114:18-115:4; Pl. Exs. 39; 61; Gremillion Decl. at ¶21; Senter Decl. at ¶ 13. By demonstrating that PSIASTAND and Centurum's Technical Approach are proprietary trade secrets, Centurum has established a high likelihood of success on

the merits regarding Geocent's use, disclosure, and misappropriation of trade secrets. This is in contrast with the Centurum employee information at issue, which is not proprietary and will be excluded from any injunctive relief granted. Although ambiguity remains regarding which contracts are still in effect, the parties' contractual obligations surrounding proprietary information survive termination of the agreements. Moreover, as discussed in Section II, this Court has jurisdiction over any injunctive relief that may be sought in connection with the breach of proprietary information obligations in these agreements. The Court will now move to the second requirement for injunctive relief: irreparable harm.

### a. Requirement 2- Irreparable Harm

To secure injunctive relief, the movant must demonstrate that it will suffer imminent and irreparable harm in the absence of the relief sought. Fed. R. Civ. P. 65. The Fifth Circuit has held that "the equitable injunctive power of the federal court will not be exercised save in exceptional cases to prevent irreparable injury which is clear and imminent." *Heath v. City of New Orleans*, 320 F. Supp. 545, 546 (E.D. La.1970), *aff'd*, 435 F.2d 1307 (5th Cir.1971). "Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985). *See also Monumental Task Comm., Inc. v. Foxx*, 157 F.Supp.3d 573, 583 (E.D. La 2016). Moreover, "a loss of a business' customers and damage to its goodwill are widely recognized as injuries incapable of ascertainment in monetary terms and may thus be irreparable." *Johnson Controls, Inc. v. Guidry*, 724 F. Supp. 2d 612, 626 (W.D. La. 2010) citing *Allied Mktg. Grp., Inc. v. CDL Marketing, Inc.*, 878 F.2d 806 (5th Cir. 1989); *Heil Trailer Int'l Co. v. Kula*, 542 F. App'x 329, 336 (5th Cir. 2013) (recognizing, under Texas law, that the "threatened disclosure of trade secrets constitutes irreparable injury as a matter of law" and "harm to the trade secret owner may be presumed").

Here, Centurum alleges that it will suffer irreparable harm if the status quo is not preserved. Specifically, Centurum argues that it will lose its trained employees, valuable proprietary information, and share of work providing services to the USMC. 1/28/21 Hear. Tr. at 60:2-22. Centurum also fears it will lose its business reputation. *Id.* Geocent, on the other hand, argues that "Plaintiff's alleged irreparable harm is also based on its inaccurate speculation on Geocent's actions." Def. Post-Trial Brief at 36. Geocent contends that Geo4S is responding to a government solicitation that Centurum could never qualify for, and Geo4S has never hired any Centurum employees and will not recruit them in the future. *Id.* at 35-36.

As a preliminary matter, the Court will not examine whether Centurum will suffer irreparable harm due to the potential rebadging of Centurum employees. The information gleaned from Mr. Arzbach's December 2020 conversations with the IV&V employees is not proprietary, and any breach of the hiring and solicitation limitations of the 2017 and 2019 Teaming Agreements must be resolved through arbitration.

The Court concludes that Centurum will suffer imminent and irreparable harm in the absence of an injunction pertaining to the use, possession, and disclosure of Centurum's proprietary information. In January 2021, Geo4S used substantial portions of Centurum's proprietary Technical Approach its submission to the SBA in connection with the USMC Hybrid Cloud Services Program procurement. The Court acknowledges that Centurum was ineligible for this solicitation. However, at the preliminary injunction hearing, Centurum sufficiently demonstrated the threat to its reputation, competitive edge, and future share of USMC work posed by this action and future potential use of its trade secrets. Centurum demonstrated that the valuable PSIASTAND and Technical Approach trade secrets give it a competitive edge in the government cybersecurity marketplace. Moreover, Centurum showed that Geocent's use of Centurum trade

secrets while collaborating with other companies poses an unquantifiable, actual harm to Centurum with regard to loss of market share and the threat of dissemination of its valuable proprietary information. Accordingly, injunctive relief will be granted with regard to the use, possession, and disclosure of Centurum's proprietary information.

### b.  *Requirement 3- Balance of Equities*

The movant must also show that the threatened injury to the movant outweighs the harm that the injunction may cause the nonmovant. Here, Centurum faces unquantifiable loss to its reputation, competitive edge, and loss of market share if a preliminary injunction is not issued to prevent the dissemination, use, and disclosure of its proprietary trade secrets. Defendants, on the other hand, do not face that degree of harm if an injunction were put into place. Geo4S may continue to pursue other government cybersecurity opportunities and in fact had already pursued another opportunity in August 2020. Geocent's concerns about losing an opportunity to obtain future contract is without merit because the injunctive relief at issue only relates to the improper use, possession, and disclosure of Centurum's trade secrets. Geocent has expressed that it can easily "return or destroy any of plaintiff's information identified by plaintiff that is in its possession." Defendants' Post-Trial Brief at 36. Accordingly, the balance of equities favors Centurum with regard to enjoining the improper use, possession, and disclosure of its trade secrets.

### c.  *Requirement 4- Public Interest*

Finally, the movant seeking injunctive relief must also demonstrate that injunctive relief will not disserve the public interest. An injunction to enforce the correct application of the law, in and of itself, serves the public interest. *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 585 (5th Cir. 2013) (finding that the public is served when the law is followed). Protecting against the misappropriation of trade secrets is aligned with the public interest. *Aspen*

*Tech., Inc. v. M3 Tech., Inc.*, 569 F. App'x 259, 273 (5th Cir. 2014) (finding that it was in the interest of public policy to prohibit the sale and use of M3 products containing infringing source code and that were derived from the improper misappropriation of trade secrets). Courts generally find that the public interest is served when a company's right to proprietary information is protected. *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481 (1974). Because the injunctive relief at issue at issue here would enforce the DTSA and LUTSA and protect Centurum's proprietary information, the Court concludes that Centurum has shown that an injunction would serve the public interest.

### V.     CONCLUSION

For the reasons stated above, the Court holds:

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss, R. Doc. 40, is **GRANTED IN PART** and **DENIED IN PART.** Defendants' Motion is granted with respect to Count III and denied with respect to Count I and Count IV. The Court may only entertain Centurum's Count III's claims to the extent they relate to the use, possession, or disclosure of proprietary information.

**IT IS FURTHER ORDERED** that Plaintiff's application for injunctive relief is **GRANTED IN PART** and **DENIED IN PART.** The application is **DENIED** with respect to Centurum's request that the Court enjoin Geocent from contacting or soliciting personnel. The application is **GRANTED** with respect to the following:

1. Accessing, studying, copying, using, disclosing, disseminating, taking notes on, or otherwise considering for any purpose Plaintiff's proprietary information and trade secrets, including but not limited to the PSIASTAND tool and Centurum's Technical Approach;

2. Returning to Centurum the information, property, and storage devices containing Plaintiff's proprietary information and/or trade secrets.

3. Ceasing to destroy, alter, erase, secrete, or failing to preserve any and all of Plaintiff's business materials, property, proprietary information, confidential information or trade secrets, and/or any and all record or documents that may be relevant to this lawsuit, wherever located, and in whatever form, including but not limited to any documents, emails, reports, software, files, electronic data, tangible evidence, financial records, and any and all communications between any employee, member, owner, investor, or consultant of Geocent and/or Silversword, or their parent companies, subsidiaries, or joint ventures.

New Orleans, Louisiana, this 12th day of February 2021.

United States District Judge